**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **JESSE FELDER,** | : | **CIVIL ACTION** |
| **Plaintiff,** | : | |
| | : | **No. 13-4438** |
| **v.** | : | |
| | : | |
| **PENN MANUFACTURING INDUSTRIES, INC.** | : | |
| **and CHRIS AFFLERBACH,** | : | |
| **Defendants.** | : | |

**MCHUGH, J.**                                                         **APRIL 20, 2016**

## MEMORANDUM

　　This case arises out of a physical altercation between two employees, one of whom was not only terminated but was ultimately found guilty of criminal charges as a result of his conduct.  Plaintiff contends that the outburst resulting in his discharge and conviction was the product of a racially hostile work environment.  Discovery is now complete.  Although the record might support an inference that Plaintiff's co-worker was racially insensitive and rude, the evidence is not sufficient for a jury to find the kind of pervasive conduct legally required to prove a hostile environment.  Accordingly, the Motions for Summary Judgment filed by Defendants Penn Manufacturing Industries, Inc. ("PMI")[1] and Chris Afflerbach will be granted.

**I.   Facts**

　　PMI is a company that provides manufacturing and engineering services.  PMI's Human Resources Manager, Michael Hartz, interviewed and hired Plaintiff in August 2010 as a general maintenance worker, responsible for tasks like emptying the trash, cleaning bathrooms, and breaking down boxes at the company's plant.  Soon after beginning work, Plaintiff, who is black,

---

[1] The parties have stipulated to the dismissal of Defendants American Manufacturing & Engineering and PMI Engineering Exports PVT Ltd.  PMI Mot. Summ. J. at 2.

had several interactions with a white co-worker, Afflerbach, in the lunchroom.  First, Plaintiff

claims that he heard Afflerbach speak loudly in the lunchroom about his animosity toward some

of their other co-workers who were immigrants from India.  Plaintiff testified:

> He [Afflerbach] would go over and set his lunch down, walk in front of me, get one of their [the immigrant workers'] chairs and stop in front of me like this and say, "These motherfuckers come on in and take our jobs.  I have been here 18 years" … Then he would go back over there and sit down, and the next day he would do the same thing.

Felder Dep. at 26:20–27:5.

On another occasion, just after Labor Day 2010, Plaintiff reports that he began using a

microwave to heat up a leftover barbeque sandwich.  He says Afflerbach tapped him on the

shoulder and asked, "What are you doing?  Frying bacon?"  *Id.* at 25:18–23.  Felder told him he

was heating his lunch, and Afflerbach did not respond.  *Id.* at 62:15–63:21.

About a day later, another exchange occurred involving the lunchroom microwaves.

Felder claims that he had placed his food in a microwave to cook, and even though Afflerbach

was finished eating and did not need to use the microwave, Afflerbach came over, opened the

microwave, and took Plaintiff's food out.  *Id.* at 64:15–66:20.  Afflerbach describes the incident

somewhat differently:

> Q: Okay.  Tell me about the microwave incident.
> A: He had food in the microwave.  The buzzer went off.  It was done.  I took it out.  Put my food in, and he came over and got all upset about it.

Afllerbach Dep. at 31:14–20; *see also* Prelim. Hr'g Tr. at 6.  He claims he did not even know the

food belonged to Felder.  Criminal Trial Tr. at 62:14–16.  Plaintiff claims he was so upset by this

"microwave incident" that he went out and bought his own refrigerator and microwave to keep in

a different room so that he could avoid using the lunchroom.  Felder Dep. at 26:7–10.

Felder contends that from that point forward, Afflerbach went out of his way to harass and intimidate him.  Felder says that he worked close to Afflerbach on the floor during some tasks, and Afflerbach would stop and stare at Felder while he worked.  *Id*. at 29:3–5.  Felder also says that many times he would section off parts of the bathroom while he cleaned, and Afflerbach would come to the bathroom while he was cleaning just to stare at him:

> He knew my schedule.  When I would go to the bathroom to clean the bathroom, he would come in the bathroom with both hands in his pocket.  From the time I started until the time I was terminated, he would never use the bathroom.  He would come in and look at me.  Never said nothing.  So this went on for a month or two.

*Id.* at 29:9–16.  During this period, Felder did not know Afflerbach's name (and, in fact, did not learn his name until the commencement of this litigation).  *Id.* at 55:15–18.

### A.  *PMI's Awareness of the Events*

There is evidence that some of the other employees, including PMI managers, knew that there was some interpersonal conflict between Felder and Afflerbach.  First, Felder claims that he reported the microwave incidents to another co-worker, David Hilliard, though Hilliard denies it.  *Id.* at 30:15–18; Hilliard Dep. at 29:7–30:1; 37:5–38:7.  Plaintiff claims that he believed Hilliard was his supervisor because on Plaintiff's first day, Hartz asked Hilliard to show Plaintiff around and show him where to keep supplies.  Felder Dep. at 24:18–20; 69:24–25.  Felder also says he believed that Hilliard would report any complaints to Hartz.  *Id.* at 121:4–5.  The record is clear, however, that Hartz was Plaintiff's only direct supervisor, and Hilliard was merely a co-worker.  Savoca Dep. at 9:2–3.  Hilliard affirmed that this was also his understanding, and if Felder came to him to ask him what to do, Hilliard referred him to Hartz.  Hilliard Dep. at 19:16–20:10.

Hartz, who was in fact Plaintiff's direct supervisor, stated that he was aware that Felder had complained of "people messing with him," and he "tried to handle it on a manager level by telling Jesse to stay away from whoever was doing it."  Prelim. Hr'g Tr. at 12.  Felder confirmed that Hartz tried to talk to him about these rumors, and he says he explained to Hartz that he bought a microwave to "eliminate problems with this guy."  Felder Dep. at 120:20–21.  But Felder also concedes he told Hartz that he did not want to "get involved" because "it was penny ante stuff."  Criminal Trial Tr. at 137:15–19.  In addition, Hartz testified that Felder's complaints did not focus solely on Afflerbach; Hartz says Felder was "always coming to me saying somebody was messing with him," but the complaints generally focused on other incidents, like people moving his supplies, and he never gave names.  *Id.* at 95:9–24.  Hartz maintains, and Felder does not dispute, that he never received any reports that racial epithets were ever used in the workplace.  Prelim. Hr'g Tr. at 11–12.

Plant Manager Phil Savoca also testified that Felder spoke with him "on a daily basis" and frequently complained about his perception that other employees were "against him." Savoca Dep. at 81–83.  Savoca explained that if someone made a mess in the bathroom or used too much toilet paper, Felder expressed a conviction that someone was "out to get" him, even if he did not know who that person was.  *Id.* at 83–84.  Savoca also says he heard a rumor about the microwave incident, and he believed Felder's and Afflerbach's respective supervisors discussed it with them.  *Id.* at 49:11–20.  Finally, Savoca says he also noticed Felder purchased a microwave and refrigerator, but that did not concern him because it was not uncommon in the office for employees to purchase their own refrigerators and coffee pots to keep in their offices. *Id.* at 77:5–80:4.[2]

---

[2] Felder also confided in several co-workers.  He frequently told Jack Walsh that he was having "problems with a guy in the shop."  Felder Dep. at 42:4–13.  Walsh says that Felder would not provide names, and Walsh advised him

Afflerbach's supervisor, Curtis States, also spoke with Afflerbach about his behavior at the plant. States said that Hartz told him about the second "microwave incident" with Felder, so States told Afflerbach that Felder was upset and he should not talk to Felder anymore. States Dep. at 32; Prelim. Hr'g Tr. at 6–7. States also heard a rumor that Afflerbach had been making statements about how he did not like Indian food, so he also told Afflerbach to stop making those statements. Afflerbach Dep. at 39–40; Criminal Trial Tr.at 58:13–20. States said that this informal approach of dealing with inter-office conflicts by telling employees to stay away from each other reflects PMI's typical practice. States Dep. at 51–52.

B. *The Box Incidents*

Felder alleges that the hostile work environment he was experiencing eventually culminated in two physical altercations. First, on February 10, Felder was working on the plant floor in a space that he had set up to cut and break down cardboard boxes. He claims that Afflerbach walked into his area, bumped into him, and kicked a box near him. The following day, Felder says that Afflerbach did the same thing; he entered the area in which he was cutting boxes, kicked a box and checked Felder on the shoulder, then looked at him and smiled. Felder Dep at 31:14–17. Felder's account of these interactions is disputed by other witnesses. There is a video from the February 11 encounter that does not reflect any overtly aggressive conduct by Afflerbach towards Plaintiff. Although the parties dispute many of the details of these events, what is not in dispute is that Plaintiff then left the area, retrieved a nail-studded club, and assaulted Afflerbach.

Plaintiff was later convicted of aggravated assault. Criminal Trial Tr. at 159.

---

to talk to a supervisor about it. Walsh Dep. at 10:20–24; 16:21–23. Felder also spoke with another co-worker, Michael Schenk, about his conflict with Afflerbach. Schenk says he discussed with Felder how in Schenk's view Afflerbach's demeanor showed that he believed "he was above everybody else," especially minorities. Schenk Dep. at 27:23–28:1; Criminal Trial Tr. at 147:1–9.

**II.  Summary Judgment Standard**

Summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2).  A fact is material if it "might affect the outcome of the suit under the governing law," and a dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  "Factual disputes that are irrelevant or unnecessary will not be counted."  *Id.*

The party moving for summary judgment has the initial burden of identifying the portions of the record that demonstrate an absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The movant can meet this burden simply by "pointing out … that there is an absence of evidence to support the nonmoving party's claims."  *Id.* at 325.  The non-moving party must then "rebut the motion with facts in the record and cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument."  *Berckeley Inv. Group. Ltd. v. Colkitt,* 455 F.3d 195, 201 (3d Cir. 2006).  "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff."  *Anderson*, 477 U.S. at 252;  *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (stating that the opponent of summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts.").  If the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden at trial," summary judgment is appropriate.  *Celotex,* 477 U.S. at 322.

6

It is not a court's role to make credibility determinations or weigh the evidence, but a court must assess "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Liberty Lobby*, 477 U.S. at 251–52.

## III. Discussion

Plaintiff's first claim asserts that PMI violated Plaintiff's rights under 42 U.S.C. § 2000e ("Title VII") and 42 U.S.C. § 1981 by allowing Afflerbach to subject him to a hostile work environment because of his race. Title VII prohibits harassment that is "sufficiently severe or pervasive to alter the conditions of [the plaintiff's] employment and create an abusive working environment." *Meritor Sav. Bank, FSB v. Vinson,* 477 U.S. 57, 67 (1986).

> To succeed on a hostile work environment claim, the plaintiff must establish that 1) the employee suffered intentional discrimination because of his/her [race], 2) the discrimination was severe or pervasive, 3) the discrimination detrimentally affected the plaintiff, 4) the discrimination would detrimentally affect a reasonable person in like circumstances, and 5) the existence of *respondeat superior* liability. *Jensen v. Potter,* 435 F.3d 444, 449 (3d Cir. 2006), *overruled on other grounds by Burlington N. & Santa Fe Ry. Co. v. White,* 548 U.S. 53 (2006). The first four elements establish a hostile work environment, and the fifth element determines employer liability. *Huston v. Procter & Gamble Paper Prods. Corp.,* 568 F.3d 100, 104 (3d Cir. 2009).

*Mandel v. M & Q Packaging Corp.*, 706 F.3d 157, 167 (3d Cir. 2013). The same test is applied to employment discrimination claims brought under § 1981. *Brown v. J. Kaz, Inc.,* 581 F.3d 175, 181–82 (3d Cir. 2009).[3]

---

[3] The text of section 1981 provides that "all persons ... shall have the same right ... to make and enforce contracts ... as is enjoyed by white citizens." 42 U.S.C. § 1981(a). "Section 1981 offers relief when racial discrimination blocks the creation of a contractual relationship, as well as when racial discrimination impairs an existing contractual relationship, so long as the plaintiff has or would have rights under the existing or proposed contractual relationship." *Domino's Pizza, Inc. v. McDonald,* 546 U.S. 470, 476 (2006). Because a hostile work environment claim requires proof that the conditions of the workplace were altered, § 1981, as amended by the Civil Rights Act of 1991, encompasses such a claim. *See Jackson v. Motel 6 Multipurpose, Inc*., 130 F.3d 999, 1008 n.17 (11th Cir. 1997).

A.  *Intentional Discrimination Because of Race*

"Title VII does not prohibit all verbal or physical harassment in the workplace; it is directed only at discrimination *because of*" a protected characteristic.  *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998) (emphasis added) (internal citations omitted).  I previously observed that Plaintiff made "clear allegations [in the Complaint] that the discriminatory and abusive actions he suffered were based on his race."  October 28, 2014 Court Order at 3.  However, the clarity of the racial animus is less apparent when the Court looks beyond those allegations and views the actual record as presented.  Contrary to the allegations in the Complaint, Plaintiff has produced no evidence that Afflerbach used any language derogatory to African Americans directed toward him or even in his presence.  At most, Afflerbach made comments to Plaintiff that expressed negative sentiments about immigrant co-workers, and he used racial slurs outside of the workplace.

Employee Al Reichenbach, for example, testified that he has heard Afflerbach use racial slurs, including ni**er, but this always occurred outside of the workplace.  Reichenbach Dep. at 33–34; 36.  Afflerbach admits that he has used ni**er, but he also said it has always been as a joke, and always outside of the workplace.  Afflerbach Dep. at 35–36.  Schenk says he may have heard Afflerbach use that word, but it was never directed towards anyone.  Schenk Dep. at 30:15–20.  Schenk testified that he got the feeling that Afflerbach thought Caucasians were superior to minorities and he believed "he was above everybody else," but he could not explain why he thought that.  Schenk Dep. at 27:23–28:1, 30:15–20; Criminal Trial Tr. at 147:1–9.  He also said that Afflerbach had conflicts with other minority coworkers, including an Egyptian

man.  Schenk Dep. at 45:7–46:1.  Afflerbach also expressed at work that he was upset by his

belief that foreigners were taking American jobs.  Criminal Trial Tr. at 41–42.[4]

      Racist comments solely directed toward others and made outside of Plaintiff's presence

cannot alone prove the first element of a hostile work environment claim; he cannot show that

the comments would not have been uttered but for *his* race if he "was neither on the receiving

end nor the subject of any comments."  *Caver v. City of Trenton*, 420 F.3d 243, 264 (3d Cir.

2005).  However, evidence of those comments may be considered in determining whether

facially neutral conduct on the part of a defendant was actually based on race.  *Id.* at 264.  Acts

of racial harassment need not include overt racist overtones in every instance in order to create a

hostile work environment.  *Andrews v. City of Philadelphia*, 895 F.2d 1469, 1485 (3d Cir. 1990).

This is in part because

> [t]hough they still happen, the instances in which employers and employees
> openly use derogatory epithets to refer to fellow employees appear to be
> declining.  Regrettably, however, this in no way suggests that discrimination
> based upon an individual's race, gender, or age is near an end. … [V]iolators
> have learned not to leave the proverbial "smoking gun" behind.  As one court has
> recognized, "[d]efendants of even minimal sophistication will neither admit
> discriminatory animus or leave a paper trail demonstrating it."  *Riordan v.*
> *Kempiners,* 831 F.2d 690, 697 (7th Cir. 1987).  But regardless of the form that
> discrimination takes, the impermissible impact remains the same, and the law's
> prohibition remains unchanged.  "Title VII tolerates no racial discrimination,
> subtle or otherwise." *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 801
> (1973)."

*Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074, 1081–82 (3d Cir. 1996).  A plaintiff,

therefore, need only show "that race is a substantial factor in the harassment, and that if the

---

[4] Felder also cites purported comments by Hilliard that Afflerbach was "prejudiced," Felder Dep. at 123:15, and by
Reichenbach that Afflerbach had "a very big problem," *Id.* at 125:12–25, as evidence of racial animus.  However,
those witnesses deny that they made such statements. Hilliard Dep. at 37:1–4; Reichenbach Dep. at 23-24.  Because
they appear to be offered to prove the truth of the matter asserted—that Afflerbach was prejudiced and had a
problem with minorities—these comments are hearsay and may not be considered on a motion for summary
judgment unless they fall within some exception.  Fed. R. Evid. 801(c); *Smith v. City of Allentown*, 589 F.3d 684,
693 (3d Cir. 2009) ("Hearsay statements that would be inadmissible at trial may not be considered for purposes of
summary judgment").  The parties do not address this, and no exception springs to mind, but ultimately admissibility
is of no consequence here because I find that Plaintiff has met his burden even without this additional evidence.

plaintiff had been white []he would not have been treated in the same manner." *Id.* (citing *Andrews*, 895 F.2d at 1485; *see also Cardenas v. Massey*, 269 F.3d 251, 262 (3d Cir. 2001) ("Cardenas has provided evidence from which a jury might find ethnic animus underlying other ostensibly nondiscriminatory incidents.").[5]

Therefore, although evidence of Afflerbach's comments in other contexts is not, by itself, sufficient to meet Plaintiff's burden on this element, this background may support the inference that Afflerbach was engaging in his actions because he was harboring racist sentiments. As I have previously opined, the gravity of using racial slurs such as ni**er is extremely serious, as that word has been described as the "paradigmatic slur" toward African Americans and the "most socially consequential insult." *Mason v. Se. Pennsylvania Transp. Auth.*, __ F.Supp.3d __, No. 14-CV-1372, 2015 WL 5544358, at *5 (E.D. Pa. Sept. 18, 2015) (quoting Randall Kennedy, Nigger: The Strange Career of a Troublesome Word, (Pantheon Books, 2002), at 27, 32). Afflerbach's admitted use of the term is difficult to isolate from his conduct.

There are potentially innocuous explanations for each of Afflerbach's actions. It is possible that Afflerbach was merely taking Felder's food out of the microwave because it was done and he wanted to heat his own food, per lunchroom custom. Afflerbach may have entered the bathroom because he wished to use it during times when Felder was cleaning it, not because he wished to silently harass him on account of his race. The video of the "bumping" incident preceding the assault can be interpreted as Afflerbach contends – that he walked through Felder's workspace because it served as a useful shortcut. But in deciding a motion for summary judgment, I must take all justifiable inferences in Plaintiff's favor and not make my own

---

[5] Defendants each argue that Felder has to produce evidence that he was singled out for harassment. A district court may, but is not required, to consider evidence of discriminatory conduct directed at other individuals to determine whether neutral conduct was actually based on a protected characteristic. *Andrews,* 895 F.2d at 1485. The lack of comparator evidence is therefore not dispositive.

determinations of credibility.  *Liberty Lobby, Inc.*, 477 U.S. at 255 ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge."). As noted by the Court of Appeals:

> Particularly in the discrimination area, it is often difficult to determine the
> motivations of an action and any analysis is filled with pitfalls and ambiguities.
> … What may appear to be a legitimate justification for a single incident of alleged
> harassment may look pretextual when viewed in the context of several other
> related incidents.

*Andrews*, 895 F.2d at 1484 (concluding that missing files, anonymous calls, and vandalism could be evidence of sexual hostility) (quoting *Vance v. Southern Bell Tel. and Tel. Co.*, 863 F.2d 1503, 1510 (11th Cir. 1989)).  A jury could certainly accept Afflerbach's explanation of his conduct, but a reasonable jury could also accept Plaintiff's contention that he was being bullied because of his race.

### B.  Severe or Pervasive

Nonetheless, even if Plaintiff can establish that Afflerbach's actions were motivated by racial hostility, Mr. Felder still bears the burden of proving that those actions were so severe or pervasive that they altered the conditions of his employment and created an abusive environment.  *Meritor Sav. Bank*, 477 U.S. at 67.  In this case, no reasonable jury could find that Plaintiff has met his burden on this element.

Title VII does not impose a "general civility code" on the workplace.  *Oncale*, 523 U.S. at 80.  "Simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment."  *Faragher v. City of Boca Raton,* 524 U.S. 775, 788 (1998) (internal quotes and citations omitted).  "To determine whether an environment is hostile, a court must consider the totality of the circumstances, including 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably

11

interferes with an employee's work performance.' " *Mandel*, 706 F.3d at 168 (citing *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 23 (1993)); *see also Caver,* 420 at 262–63 ("[A] discrimination analysis must concentrate not on individual incidents, but on the overall scenario.").

Plaintiff argues that Afflerbach's actions constituted a "campaign" of intimidation—beginning with bullying him in the lunchroom, then staring at him while he worked in the bathroom, and culminating in two physical confrontations in his workspace. The record shows that there was some friction between these two employees. However, none of Afflerbach's actions can be fairly described as "severe," nor can it be said that his actions produced a "pervasive" climate of harassment. Removing a co-worker's food from the microwave and commenting upon what he is cooking may be interpreted as rude, but it was certainly did not interfere with Plaintiff's ability to complete his work. Plaintiff describes the two "bumping" incidents as the culmination of Afflerbach's actions, but the record includes video footage of the second event objectively demonstrating how relatively trivial it was. Although I am mindful of the need to take all inferences in Plaintiff's favor and not make my own determinations of credibility, even a jury who believes Felder's description of how Afflerbach entered the bathroom every day while Felder was cleaning, or stared at Felder every time he passed his workspace, could not reasonably find that this repetitive action by a single co-worker altered the conditions of his employment to the extent that it created a hostile work environment. As to whether it was pervasively hostile, I also find it significant that Afflerbach had no apparent allies; rather, Plaintiff's co-workers offered their moral support. Nor is their evidence that Plaintiff sought assistance from management and was ignored.

"[C]onduct must be extreme to amount to a change in the terms and conditions of employment." *Caver*, 420 F.3d at 262 (citing *Faragher*, 524 U.S. at 788). The conduct the

12

Plaintiff has shown simply does not amount to the "severe and pervasive" standard required by *Meritor* as a matter of law.[6]  Summary judgment must be granted in favor of PMI on the first claim.

## IV. Claim against Afflerbach

Plaintiff also asserts a claim under § 1981 against Afflerbach.  Although claims against individuals are not permitted under Title VII, the Third Circuit "has found individual liability under § 1981 'when [the defendants] intentionally cause an infringement of rights protected by § 1981, regardless of whether the [employer] may also be held liable.' " *Cardenas*, 269 F.3d at 268 (citing *Al–Khazraji v. Saint Francis Coll.,* 784 F.2d 505, 518 (3d Cir. 1986)).  Plaintiff claims that Afflerbach may therefore be held liable for his participation[7] in creating a racially hostile work environment.  Pl.'s Sur-Reply Opp. Mot. Summ. J. at 13.  However, though Plaintiff need not prove employer liability to recover against Afflerbach, such a claim depends upon the existence of an underlying hostile work environment.  Because I find that Plaintiff has failed to meet his burden of proving the first two elements of such a claim as a matter of law, his § 1981 claim against Afflerbach must also fail.

---

[6] Plaintiff relies on an expert psychological report, which states in part:

> Fully crediting Mr. Felder's account of the events that allegedly occurred at PMI Industries, Inc. *and his background*, it would be understandable that he continues to have upsetting recollections of what transpired during his brief tenure there *as well as prior traumatic experiences.*
> . . . .
> His reaction … was not unlike how many other individuals in a similar situation would have responded.

Toborowsky Report at 7–8 (emphasis added).  This may lend support to the third prong of the test for a hostile work environment—whether Afflerbach's actions "would detrimentally affect a reasonable person in like circumstances"—but is immaterial as to whether Afflerbach's actions meet the legal threshold required to constitute objectively "severe or pervasive" discrimination.

[7] The law is somewhat unclear regarding individual liability against non-supervisory co-workers.  The Third Circuit's reasoning for permitting individual § 1981 claims in *Al-Khazraji* is based on tort principles that hold directors, officers, and agents liable for their part in torts committed by a corporation.  *Al-Khazraji*, 784 F.2d at 518.  Since the record shows no evidence that Afflerbach had power to direct the activities of PMI, this claim stretches the limits of current doctrine.

**V.  Conclusion**

Inasmuch as Plaintiff has failed to meet his burden of proving the second element of a hostile work environment claim, summary judgment must be granted in favor of Defendants on all claims.  An appropriate order follows.

_____/s/ Gerald Austin McHugh
United States District Court Judge